# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Jesus L. Leon, and Fabian Lopez,<br><br>　　　　Defendants. | CR-10-2104-TUC-CKJ-DTF<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is Defendant Fabian Lopez's Motion to Suppress Evidence (Doc. 19), in which Defendant Jesus L. Leon joined (Doc. 20). The government responded in opposition (Doc. 27) and Defendant Lopez replied (Doc. 30). This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Defendants' motion was set for evidentiary hearing and evidence was heard on December 13, 2010 (Doc. 37), and February 1, 2011 (Doc. 54). Defendants were present and represented by counsel. This matter was submitted following the conclusion of the hearing and taken under advisement. With permission, Defendant Leon and the government filed post-hearing supplemental memoranda. (Docs. 59, 63.)

Defendants' motion seeks to suppress evidence seized as the result of a stop and search. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendants' Motion to Suppress.

# I.

# **FACTUAL FINDINGS**

On the afternoon of July 21, the border patrol checkpoint on Route 83 had been closed due to inclement weather. (RT 12/13/10 at 9, 13-14.)[1] According to all three border patrol agents who testified at the motions hearing, there is a rise in smuggling activity when checkpoints are closed and during shift change. (*Id.* at 14, 15-18, 119-21; RT 2/1/11 at 6.)

On July 21, 2010, around 4 p.m.,[2] Border Patrol Agent Cody Adams saw a flatbed truck traveling north on Route 82.[3] (RT 12/13/10 at 13, 19.) He estimated the truck was traveling approximately 45 miles per hour in a 55 mile per hour zone, which was uncommon in that area. (*Id.* at 20.) According to Agent Adams, the truck looked out of place, it had no cargo on the flatbed and there were no straps that could have been used to hold cargo. (*Id.* at 20-21, 25, 106-09.)[4] In addition, the truck appeared to be intentionally smeared with concrete, including the license plate. (*Id.* at 13, 19.) As Agent Adams passed the truck he saw what he believed to be a false compartment under the bed. (*Id.* at 19-20, 22, 25, 27.) About one year earlier he had participated in a search of a similar flatbed truck that had a false compartment located in the same place, which had been loaded with marijuana. (*Id.* at 28, 53-54, 98.) Agent Adams also noted that the driver appeared nervous and was wearing an orange vest. (*Id.* at 21.) The vest also piqued Agent Adams's interest because he had seen

---

[1] "RT" refers to the Reporter's Transcript of the December 13, 2010, and February 1, 2011 evidentiary hearing.

[2] On July 21, 2010, the standard border patrol shifts at the Sonoita station were from 7 a.m. to 3 p.m. and from 3 p.m. to 11 p.m., creating a gap in coverage due to shift change between approximately 3 and 4 p.m. (RT 12/13/10 at 7, 15, 164-66.)

[3] To get to Tucson while traveling north on Route 82, a person would drive to Route 83 in Sonoita, Arizona, then travel north on Route 83 to I-10. (*Id.* at 9.)

[4] Agent Adams had worked in this area and was familiar with the local traffic using Routes 82 and 83. (*Id.* at 8.)

- 2 -

1 others involved in criminal activity wear similar vests in an attempt to appear to be
2 construction workers. (*Id.*) Agent Adams then advised Agents Snyder and Haymore about
3 what he had seen and asked for their assistance. (*Id.* at 29, 122.)

4    Agents Snyder and Haymore were also traveling north on Route 82 and quickly
5 caught up to the truck, which was only traveling about 40 to 45 miles per hour when they
6 reached the truck's location. (*Id.* at 31, 124.) Agent Snyder noticed that the rear end of the
7 truck was unusual because it was constructed so that he could not see the frame or the rails;
8 he also saw the unnatural concrete and mud splatter, and the lack of tie downs that are
9 usually seen on a flatbed truck. (*Id.* at 123, 126-28.) Agent Snyder had worked at his family's
10 construction company before becoming a border patrol agent and he also found it suspicious
11 that the driver was wearing the vest because, in his experience, people ordinarily do not wear
12 a safety vest when driving, except when operating large equipment. (*Id.* at 123-25.)

13    Agent Snyder stopped the truck. (*Id.* at 31-32.) Defendant Lopez was identified as the
14 driver and Defendant Leon the passenger. (*Id.* at 35-36, 48-50, 94.) Agents Adams and
15 Snyder examined the suspected compartment and found it to be constructed with sheet metal
16 that was tack welded under the truck with spotty black spray paint, indicating an after market
17 compartment above it. (*Id.* at 32, 133-34.) When they tapped on the sheet metal it sounded
18 like there was something inside. (*Id.* at 33, 134.) Agents also found it suspicious that the
19 frame rails and drive train were splattered with concrete and mud because the splatter did not
20 correspond to the location where the tires would throw dirt. (*Id.* at 135; *see also* RT 2/1/11
21 at 38.)

22    Meanwhile, Defendant Lopez was being interviewed by other agents. He told them
23 that he had just come from a construction site, however, his clothing was clean, which
24 seemed inconsistent with his claim. (RT 12/13/10 at 34; RT 2/1/11 at 9.) Defendant Leon told
25 the agents that he had been picked up at the Patagonia market and was traveling from Rio
26 Rico to Tucson. (RT 12/13/10 at 34-35.) This also seemed suspicious to the agents, because
27 Route 82 was a very indirect route from Rio Rico to Tucson. (*Id.* at 35.) When questioned

28

- 3 -

about why he was taking Route 82 to Tucson, Defendant Lopez said it was easier and faster, which the agents knew to be false. (RT 2/1/11 at 10.)

An agent called for a canine and an x-ray truck but was told there were none available, therefore, the agents decided to take the truck to the station for investigation. (RT 12/13/10 at 36-37, 138.) At the station, a hole was drilled into the compartment and a green leafy substance came out, which tested positive for marijuana. (*Id.* at 43, 147.) Defendants were indicted for conspiring to possess, and possessing, with intent to distribute approximately 228 kilograms of marijuana. (Doc. 8.)

## II.

## DISCUSSION

Defendants seek to suppress all evidence seized by government agents based on the stop and search being unlawful. The government responds that the stop was supported by reasonable suspicion, there was probable cause to search the vehicle, and Defendants consented to the search.

<u>Reasonable Suspicion for Stop</u>

The Fourth Amendment's prohibition of unreasonable searches and seizures extends to the brief investigatory stop of a vehicle. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Therefore, an officer must have a "reasonable suspicion" that criminal activity may be afoot to stop a motorist. *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002). When the court makes reasonable-suspicion determinations, it must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for his or her suspicions about criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In the context of stops made near a border, the Supreme Court has identified a non-exclusive set of factors that may be considered in determining reasonable suspicion: (1) characteristics of the area in which the car is traveling; (2) proximity to the border; (3) usual traffic patterns on the road; (4) prior experience with alien traffic; (5) recent illegal border crossings in the area; (6) erratic or evasive driving

behavior; (7) vehicle characteristics; and (8) the behavior or appearance of the driver. *Brignoni-Ponce*, 422 U.S. at 884-85.

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions-inferences and deductions that might well elude an untrained person.
>
> . . . .
>
> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing

*United States v. Cortez*, 449 U.S. 411, 418 (1981).

Hence, an investigatory stop must be based on facts, not the "mere subjective impressions of a particular officer," *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989), and the inferences drawn by the officer must be objective and reasonable, *Cortez*, 449 U.S. at 418. Under these circumstances, an officer may draw inferences from, and deductions about, the cumulative information based on experience and specialized training, which "might well elude an untrained person." *Id.*; *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers).

Border Patrol agents, not courts, are trained to detect smugglers, and "[t]he facts are to be interpreted in light of a trained officer's experience." *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996). The agents' observations were grounded in objectively identifiable facts. Agent Adams saw Defendants driving northbound from the border, below the speed limit, at a time when the check point was closed on Route 83 and Border Patrol agents were engaged in a shift change. *See Arvizu*, 534 U.S. at 277 (officer's consideration of defendant's presence during shift change reasonable)*; Cortez*, 449 U.S. at 418 (allowing consideration of smugglers' patterns of operation). Additionally, Agent Adams observed that

1 the driver appeared nervous and was wearing an orange safety vest, which was unusual and
2 signaled to him that the driver was trying to blend in with local construction traffic.

3       The truck's rear was covered with metal below the flatbed, which two agents observed
4 to be non-typical for a vehicle of this type. When Agent Adams passed the truck he believed
5 he could see an aftermarket compartment under the truck's bed. He noticed there was no light
6 between the flatbed and the frame of the truck and there was substantial iron under the truck.
7 Agent Adams had participated in another drug seizure from a compartment built in the same
8 location on a similar flatbed truck. Additionally, there were no straps evident for carrying a
9 load on the flatbed and the truck appeared to be smeared with concrete and mud in a pattern
10 that was unnatural. The post-seizure photographs of the vehicle admitted at the evidentiary
11 hearing support these observations, which the Court finds most significant to its analysis. *See*
12 *Brignoni-Ponce*, 422 U.S. at 884 (aspects of the vehicle itself may justify suspicion).

13       The instant case is distinct from the cases relied upon by Defendant Leon, *United*
14 *States v. Jimenez-Medina*, 173 F.3d 752, 755 (9th Cir. 1999) (finding that, 130 miles from
15 border, agent could not infer "recent border access" based on type of vehicle, slow speed,
16 driver's preoccupation, vehicle registration to Mexican national, presence on known
17 smuggling route, and time of day), and *United States v. Hernandez-Alvarado*, 891 F.2d 1414,
18 1418 (9th Cir. 1989) (finding no reasonable suspicion because factors too broad: reduced
19 speed, two-way antenna, residence in a border neighborhood under investigation for drug
20 activity, indication car purchased from dealership connected to trafficking, and size of trunk).
21 In addition to the numerous similar factors present in this case (slow speed, nervousness of
22 the driver, closed checkpoint, known smuggling route, and shift change), the appearance of
23 the truck itself supported the inference that there was a false compartment below the flatbed.
24 In sum, the facts presented here support the conclusion that, based on the totality of
25 circumstances, Agent Snyder acted with reasonable suspicion in stopping the vehicle.

26
27
28

### Probable Cause for Search

Defendants argue there was no probable cause to search the truck. Further, Defendant Leon argues in his supplemental brief that the search was improper because it is not within the bounds of the warrant exception for a search incident to a lawful arrest. The government does not rely on that exception, rather, it contends the search was valid because there was probable cause to believe the vehicle contained contraband or evidence of criminal activity. *Cf. Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009) (noting there are other exceptions to the warrant requirement for vehicle searches, besides the search-incident exception, including probable cause to believe a vehicle contains criminal activity evidence) (citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)).

As argued by the government, an agent may conduct a warrantless search of a lawfully stopped vehicle if there is probable cause to believe it contains contraband. *Ross*, 456 U.S. at 799, 825 (citing *Carroll v. United States*, 267 U.S. 132 (1925)). Probable cause exists if there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Pinela-Hernandez*, 262 F.3d 974, 978 (9th Cir. 2001).

During the stop, Agents Adams and Snyder looked under the truck and observed a compartment spot welded together and spray painted black. When the agents tapped on the compartment, the sound indicated there was something inside it. Agent Snyder noted that the splatter underneath the vehicle was not in a location expected from merely driving in a muddy area. Additionally, the driver's statement that they had come from a construction site was incongruous with his clean clothes and shoes, and the route he was taking to his intended destination of Tucson did not make sense.

Based on the observations made by the agents prior to the stop, the visual inspection of the truck after the stop, and the information gathered from speaking to Defendants, there was a fair probability that contraband would be found in the truck. Therefore, there was probable cause for the agents to search the truck. The justification for the search remains valid regardless of the truck's removal to the border patrol station for the search, which was

reasonable given the need to access the sealed compartment. *See Chambers v. Maroney*, 399 U.S. 42, 52 & n.10 (1970) (noting practicality of removing car to station because it was late at night and dark); *Michigan v. Thomas*, 458 U.S. 259, 261 (1982). Therefore, there is no basis to suppress the evidence seized as a result of the search.[5]

## III.

## RECOMMENDATION

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendants' Motion to Suppress. (Doc. 19.) Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR-10-2104-TUC-CKJ**.

DATED this 4th day of March, 2011.

D. Thomas Ferraro
United States Magistrate Judge

---

[5] Whether the initial lawful stop and detention ripened into an arrest before marijuana was discovered in the compartment, and whether any such arrest was lawful, has no bearing on the motion. The only evidence Defendants seek to have suppressed is the marijuana found as a result of the lawful search.